IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALISSA K.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 C 3091 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| ANDREW SAUL, Commissioner of Social Security, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Supplemental Security Income under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§1381a, 1382c, over three years ago in September of 2017. (Administrative Record (R.) 160-65). She claimed that she has been disabled since June 30, 2016, due to PTSD, anxiety, depression, and "bipolar." (R. 160, 176, 180). Over the next two and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. The ALJ's decision is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on May 26, 2020. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on July 31, 2020. [Dkt. #11]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

# I.

## A.

Plaintiff was born on September 27, 1996, and so, was only 19 years old when she claims she became unable to work ever again. (R. 176). Plaintiff has an 11th grade education. (R. 181). She has had one job, working at a retail store for just three months from April to July in 2015. (R. 190). She explained that she quit that job because she "had some other things come up and then . . . started babysitting." (R. 180).

The medical record in the case is not large – only about 550 pages. (R. 268-810). And, as is the case from time to time with plaintiffs claiming disability based on psychological issues like depression or anxiety, there is not much in the record to suggest the plaintiff is unable to work. Page after page of psychiatrist's notes show that plaintiff might be depressed or irritable sometimes, but much of the time she is not. In the main, her psychiatric examinations are normal. Yes, plaintiff has family stressors: sometimes she is depressed, sometimes she panics or is irritable. But she also has been diagnosed with depression. But, while it is true that severe depression is not the blues, *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995), it is also true that a diagnosis is not necessarily a disability. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998).

Plaintiff's brief suggests that relevant treatment and medical records begin in June of 2016. At that time, plaintiff began treatment with Dr. Rayal Gorrepati, M.D. (R. 803). She said she was doing "pretty good." (R. 803). She gave a history of having been raped at age 8, arrested for battery in 2012, and being on probation for destruction of property. She smoked marijuana daily, but had not used it for 3 weeks at that time. (R. 802-03). She had no problems with her sleep. Psychiatric

examination was normal throughout. Speech, thought process, abstract thinking, and computation were all normal. Judgment and insight were intact. Mood was normal. (R.804).

In August 2016, plaintiff reported she was doing "all right" and was taking GED classes. (R.799-800). Examination was again normal throughout. Speech, thought process, abstract thinking, and computation were all normal. Judgment and insight were intact. Mood was normal. (R.800). Examination results were the same in September 2016. (R. 797). Plaintiff said she was good, but didn't like taking medication and had not been compliant for 5 weeks. (R. 796).

In November 2016, plaintiff reported nightmares, poor sleep, and mood swings. (R. 793). Upon examination, speech was coherent and normal; thought process was normal, including abstract reasoning and computation; judgment and insight were intact; mood was depressed. (R. 793). Dr. Gorrepati prescribed Seroquel. (R. 794).

In January 2017, plaintiff reported that her godmother's boyfriend hit her – she had been living with them – and she moved in with her grandmother. Her mood was down as a result, but she was not having mood swings. (R.788). Mental status examination revealed anxious mood and affect. (R. 789). But speech was coherent and normal; thought process was normal, including abstract reasoning and computation; and judgment and insight were intact.. (R. 788-89).

On March 29, 2017, plaintiff saw an advanced practice nurse at Will County Community Health Center for a psychiatric evaluation. (R. 730). Plaintiff said her anxiety was well-controlled, sleep was wonderful, no panic attack in a while, but irritable. (R. 730-31). Plaintiff continued to smoke marijuana daily. (R. 731).

On September 14, 2017, plaintiff reported she hit her grandmother and was kicked out of the house. She was arrested for the attack. She reported "eating like a cow" and sleeping a lot, but her

3

mood was okay, and she wasn't depressed. (R. 702). Mood-euthymic; Affect – constricted; Thought Process – logical; Perception – normal; Cognition– normal; Intelligence – average; Insight – partial; Judgment– impaired ability to make reasonable decisions. (R. 703). Mood well-controlled with medication. (R. 705).

On November 9, 2017, plaintiff said her mood was good, she had no anxiety, her temper was okay aside from arguments with father and sister, and was sleeping well. Psychiatric examination was essentially normal: Mood-euthymic; Affect – full; Thought Process – logical; Perception – normal; Cognition– normal; Intelligence – average; Insight – partial; judgment – within normal limits; impaired ability to make reasonable decisions. (R. 694-95).

In January 2018, plaintiff said her mood was pretty good, she had no depression or anxiety; she did panic when she left the house; her anger was under control; her sleep wonderful; and she continued marijuana use. Examination revealed: Mood-anxious; Affect – constricted; Thought Process – logical; Perception – normal; Cognition– normal; Intelligence – average; Insight – partial; judgment – within normal limits although impaired ability to make reasonable decisions. (R. 684-85). Plaintiff was counseled not to use marijuana as it can cause symptoms of anxiety and depression. (R. 691).

Examination in February 2018 was about the same: Mood-anxious; Affect – constricted; Thought Process – logical; Perception – normal; Cognition– normal; Intelligence – average; Insight – partial; judgment – within normal limits although impaired ability to make reasonable decisions. (R. 678).

On March 31, 2018, plaintiff reported no depression or lack of interest in previous two weeks. (R. 668). Mood and affect appropriate. (R. 671). On April 4, 2018, plaintiff said things were

"going good", her irritability was controlled, her mood okay, sleep wonderful, she was getting out of the house, and had decreased marijuana use. Examination results were essentially normal, aside from affect: Mood-euthymic; Affect – constricted; Thought Process – logical; Perception – normal; Cognition– normal; Intelligence – average; Insight – normal; judgment – normal. (R, 662-63).

On April 27, 2018, plaintiff's mood and affect were observed to be appropriate (R. 650). On May 16, 2018, plaintiff reported no depression or lack of interest in previous two weeks. (R. 643) On July 3, 2018, plaintiff reported anxiety about new job, but she had been sleeping well, and not panicking because she was smoking marijuana. Exam was much the same: Mood-euthymic; Affect – constricted; Thought Process – logical; Perception – normal; Cognition– normal; Intelligence – average; Insight – normal; judgment – normal. (R. 636-38).

Plaintiff underwent a consultative psychological examination with Dr. John Brauer on November 13, 2017. Plaintiff recounted a history of transitional living, a childhood rape, and foster care. She said she served one month in juvenile detention for battery against her stepmother. (R. 314-15). She denied any history of suicidal thoughts over the previous 3-4 years and denied homicidal ideation at any point. (R. 316). She told the doctor she was currently studying for a GED, studying 2-3 hours at a time, three days a week. (R. 315). Dr. Brauer found her calm, oriented, and cooperative. Her affect was wide-ranging and appropriate; speech was clear and logical. (R. 316). Concentration appeared to be normal, and she was able to remain on task throughout the 50-minute examination. (R.316). Arithmetic/calculation ability was somewhat limited. (R. 316-17). General fund of knowledge was grossly intact. (R. 317). Judgement was grossly appropriate. (R. 317).

Unfortunately, the record reveals that plaintiff was not a good witness. She lied at her hearing, telling the ALJ that her doctors never told her to stop smoking marijuana. (R. 37-38). In

5

fact, she was adamant about it. When the ALJ, familiar with the medical record, challenged her on the point, she insisted the doctor "said absolutely nothing" (R. 38), when, in fact, the doctors specifically counseled her against it. Plaintiff testified that when she was around people, she would "freak out" and hide in her room, claiming that these episodes lasted two to three days. (R. 39). She further claimed that this happened *every* day. (R. 39-40). But, as the ALJ suggested, that makes no sense. (R. 40).[2] She also claimed she wouldn't tell her doctors about certain things, such as suicidal ideation, because she had too many things going on to have time to go to the hospital. (R. 41). When questioned by her attorney, plaintiff related a couple of other complaints that appear nowhere in her medical treatment: crying spells every couple of days for no reason and nightmares every night. (R. 48-49).

Finally, plaintiff's brief claims, without citation to the record or any other evidence, that she was "incarcerated for homicide", indicating that she was so violent she cold not work along side others. [Dkt. #20, at 12-13]. It's a remarkable claim for an attorney to make, unsupported, in a brief. "[A]ssertions in briefs are not evidence, nor in this case based on evidence." *Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015). Clearly, the ALJ had no such evidence before him. Moreover, the record shows that plaintiff was not incarcerated for homicide – or seemingly, even for battery as she claimed to her doctor, but was in juvenile detention in the summer of 2012, at age 15. (R. 760-82). Significantly, it was noted that she had *no* history of violent behavior (R. 768), which would rule out the claim in her brief and her claim to her doctor.

---

[2] Moreover, if it were indeed true, as plaintiff's brief contends, that she "freaks out" outside of the house and spends most of her time isolated in her room, why would she reject the opportunity to conduct her hearing remotely? (R. 118).

**B.**

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: depression, anxiety, post traumatic stress disorder, and personality disorder. (R. 17). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listings 12.04, 12.06, 12.08, and 12.15 covering plaintiff's psychological impairments. (R. 18). More specifically, the ALJ found the plaintiff's psychological impairment left her with a mild limitation in understanding, remembering, and applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, and maintaining pace; and a mild limitation in adapting or managing himself. (R. 18-19).

The ALJ then determined that plaintiff could perform work at all exertional levels, , with a number of additional limitations:

> She is able to understand, carry out, remember, and perform simple, routine and repetitive 1-2 step tasks but not at a production rate pace (e.g. assembly line work) but would complete all end of day goals; involving only simple work-related decisions with the ability to adapt to routine work place changes. She is occasionally able to interact with supervisors and coworkers. She should perform no tandem tasks with coworkers and should have superficial, non-transactional contact with the general public.

(R. 20). The ALJ went on to summarize the medical evidence and plaintiff's testimony. (R. 2–22). He then determined that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical

evidence and other evidence in the record for the reasons explained in this decision." (R. 22). The ALJ found that the reviewing psychologist's opinions limiting plaintiff to simple work and 1-2 step tasks were consistent with the record of mostly normal mental status examinations. (R. 23). The ALJ found the limitation to *no* interaction with the public not consistent with the record. (R. 23).

Next, the ALJ noted that plaintiff had no past relevant work. Then, relying on the testimony of the vocational expert, the ALJ found that, given his residual functional capacity, the plaintiff could perform other work including laundry worker (DOT 361.685-018; 63,800 jobs in national economy), transportation cleaner (DOT 919.687-014; 49,000 jobs), or industrial cleaner (DOT 381.687-018; 2,300,0000 jobs). (R. 24-25). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 25).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d

8

712, 717 (7th Cir. 2017)

The "substantial evidence" standard is a low hurdle to negotiate, *Biestek* , 139 S. Ct. at 1154. In the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result in order to afford the claimant meaningful judicial review of the administrative findings. *Fair v. Saul*, _F.Appx._, 2021 WL 1711810, at *4 (7th Cir. 2021); *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). But, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985)**.**

### III.

The plaintiff advances two main arguments for overturning the ALJ's decision. She contends that the ALJ improperly assessed the paragraph B criteria at Step 3, which led to him failing to properly account for all her limitations in the RFC, and that the ALJ improperly undermined her

9

subjective statements. In truth, however, the plaintiff raises over a dozen complaints about the ALJ's decision, few supported by caselaw, and fewer still developed beyond a sentence or two. What the plaintiff seems to be going for here is a remand by a "thousand [paper] cuts." The Seventh Circuit has frequently criticized this type of presentation, *see Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 513 (7th Cir. 2011); *United States v. Pearson*, 340 F.3d 459, 464 (7th Cir. 2003); *United States v. Evans*, 92 F.3d 540, 546 (7th Cir. 1996), calling it, variously, "the equivalent of a laser light show of claims may be so distracting as to disturb our vision and confound our analysis." *United States v. Lathrop*, 634 F.3d 931, 936 (7th Cir. 2011) (collecting cases); a "scattergun approach [that] generally does not serve [clients] well, *Cole v. Comm'r*, 637 F.3d 767, 772 (7th Cir. 2011); or a "kitchen sink approach to briefing [that] cause[s] distraction and confusion, [and] also consumes space that should be devoted to developing the arguments with some promise." *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000). A brief containing a similar litany of insubstantial arguments once caused the Sixth Circuit to remark that "[w]hen a party comes to us with nine grounds for reversing the [lower court's decision], that usually means there are none." *Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012).[3]

      Given the number of issues the plaintiff raises, one might assume that she comes forward with a wealth of medical evidence that she is disabled – evidence that the ALJ allegedly ignored. But as already discussed, there is precious little evidence in the way of abnormal psychological findings. Psychological impairments might be disabling or they might not. *See, e.g., Truelove v. Berryhill,* 753 Fed.Appx. 393, 394 (7th Cir. 2018)("intermittent explosive personality disorder,

---

[3] *Accord Walker v. Abbott Laboratories*, 416 F.3d 641, 643 (7th Cir. 2005); *United States v. Mahoney*, 247 F.3d 279, 282 (D.C. Cir. 2001).

schizoaffective disorder, cannabis abuse, mood disorder, and borderline intellectual functioning" not disabling); *Kelham v. Berryhill*, 751 Fed.Appx. 919, 921-22 (7th Cir. 2018)("bipolar disorder, anxiety, and borderline intellectual functioning" not disabling). It is the *plaintiff*'s burden to prove she is disabled by providing medical evidence beyond her claims. *See Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008)("The claimant bears the burden of producing medical evidence that supports her claims of disability. That means that the claimant bears the risk of uncertainty, ...."); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."); 20 C.F.R. § 404.1512(c)("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."). ALJs have to rely on medical opinions "based on objective observations," not "subjective complaints." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Elder v. Astrue*, 529 F.3d 408, 413, 416 (7th Cir. 2008).

## A.

The plaintiff begins by calling into question the ALJ's finding that she had only moderate limitations in interacting with others and in concentrating, persisting, and maintaining pace. [Dkt. #20, at 8-9]. The plaintiff faults the ALJ for relying on the opinions of the two state agency reviewing physicians. The ALJ accepted those opinions in large part as they were consistent with the record. It was entirely proper for the ALJ to rely on those opinions, especially as there is no contrary opinion in the record. *See Murphy v. Astrue*, 454 F. App'x 514, 519 (7th Cir. 2012); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).While plaintiff is upset that the ALJ did so, she fails to even attempt to explain how they were not. She cites to no medical evidence that

11

undermines the findings. Here, as elsewhere, insisting something is so does not make it so. *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010)( "saying so doesn't make it so ..."); *Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 473 (7th Cir. 2018). "Notably absent from these allegations, however, is any proposed proof that state actors, not municipal actors, were engaged in this de facto discrimination." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 770 (7th Cir. 2020); *Donald J. Trump for President, Inc. v. Secy of Pennsylvania*, 830 F. Appx 377, 381 (3d Cir. 2020)("Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here."). Even the Solicitor General's unsupported assertions are not enough. *Digital Realty Trust, Inc. v. Somers*, ––– U.S. –––, 138 S.Ct. 767, 779 (2018).

Next, the plaintiff argues that the ALJ's rejection of a limitation against *any* social interaction is contradicted by her claims that she was arrested for battery and incarcerated for homicide. [Dkt. #20, at 9]. But we have already criticized counsel for making such a claim without any support, especially as the record contradicts it. Nothing more need be said on that point.

Plaintiff then submits that she testified she cannot be around people because she "freaks out", and told her doctors that she had outbursts three times a week and fought with her grandmother. [Dkt. #20, at 10].[4] But these are all claims; the only piece of medical evidence plaintiff can find that is counter to the ALJ's finding is a single examination note, from November 9, 2017, of an impaired ability to make reasonable decisions. [Dkt. #20, at 10, citing (R. 695)]. At that session, the rest of

---

[4] The plaintiff misreads the ALJ's Opinion as finding that plaintiff could interact with coworkers and supervisors up to two-thirds of every day. [Dkt. #20, at 13]. The ALJ allowed for only *occasional* interaction with coworkers and supervisors, which means "occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8–hour workday.*" Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018)

the doctor's examination findings were all essentially normal. Moreover, plaintiff said her mood was good, she had no anxiety, her temper was okay aside from arguments with father and sister, and she was sleeping well. (R. 694-95). There is nothing in the report that suggests the patient is someone who must forego all interaction.[5]

Beyond that, the plaintiff says the consultative examiner "endorsed incidents of angry acting out throughout adolescence and into adulthood, as well as occasional panic attacks related to a fear of conflict, and consequent conflict avoidance." [Dkt. #20, at 10]. But the consultative examiner didn't "endorse" anything; he was merely relaying what plaintiff said. His examination, which plaintiff ignores, was, again, essentially normal.

Plaintiff takes the same approach regarding her ability to concentrate. She dismisses multiple examinations showing normal results as "brief" and unconvincing. [Dkt. #20, at 11]. But that is what the medical record showed: examination after examination with mostly normal results. Again, as already explained, a plaintiff can't apply for benefits and dismiss all her medical examinations as insignificant. *See, e.g., Winsted*, 923 F.3d at 477(holding that the ALJ properly rejected the opinion from a psychologist as it "largely reflected [plaintiff's] subjective reporting."); *Rice*, 384 F.3d at 371; *Elder*, 529 F.3d at 416. But, that is exactly what plaintiff has done: she has relied

---

[5] Addressing another of plaintiff's complaints along this line, we note that the ALJ did say that the state agency consultants' finding that plaintiff should have no limitation with the public was inconsistent with the record and noted "[s]he has no homicidal ideation, etc." (R. 23). But plaintiff, neglects the fact that the ALJ also noted that the state agency consultants found a moderate limitation in interacting with others, and noted that plaintiff socialized with her boyfriend and family daily, and that she said she could only deal with people for so long. (R. 18). Moreover, as the Commissioner points out, none of the job examples the vocational expert provided, and the ALJ adopted, require involve public contact. https://occupationalinfo.org/onet/92726.html (10 Performing For or Working With Public); https://occupationalinfo.org/onet/98905.html (4 Performing For or Working With Public); https://occupationalinfo.org/onet/67005.html (7 (I) Deal With External Customers). As such, any error was harmless. *See Schomas v. Colvin*, 732 F.3d702, 707 (7th Cir. 2013).

13

completely on her own subjective allegations. [Dkt. #20, at 11].

Perhaps realizing that page after page of trifling arguments would get her nowhere, plaintiff finally comes to what she calls "the real harm." She argues that a hypothetical and RFC that limit an individual to simple, repetitive unskilled work does not necessarily address a moderate limitation in concentration, persistence, and pace. [Dkt. #20, at 11]. But the Seventh Circuit has recently said otherwise:

> A "moderate limitation" is defined by regulation to mean that functioning in that area is "fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1. . . . "fair" in ordinary usage does not mean "bad" or "inadequate." So a "moderate" limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace.

*Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021).

Moreover, the ALJ's RFC went beyond that. The ALJ limited plaintiff to simple, routine and repetitive 1-2 step tasks performed, not at a production rate pace, but in terms of end-of-day goals. And, the ALJ drew these limitation from the state agency reviewers' opinions (R. 23), which the Seventh Circuit has found acceptable time and again. *See, e.g., Simons v. Saul*, 817 F. App'x 227, 232 (7th Cir. 2020); *Bruno v. Saul*, 817 F. App'x 238, 242 (7th Cir. 2020); *Morrison v. Saul*, 806 F. App'x 469, 474 (7th Cir. 2020); *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002). The ALJ committed no reversible error in crafting the RFC.

### IV.

That brings us to the ALJ's treatment of the plaintiff's subjective complaints. The ALJ found them to be inconsistent with "the medical evidence and other evidence in the record." (R. 22). Review of this facet of an ALJ's decision is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093,

1098 (7th Cir. 2013). A reviewing court cannot overturn an ALJ's assessment of a plaintiff's subjective complaints unless the plaintiff can show it was "'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017); *Elder*, 529 F.3d at 413–14; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). It's a difficult burden to meet, *Milliken v. Astrue*, 397 F. App'x 218, 225 (7th Cir. 2010); *Turner v. Astrue*, 390 F. App'x 581, 587 (7th Cir. 2010), and plaintiff has failed to do so here.

Plaintiff first complains that the ALJ "undermin[ed] . . . Plaintiff's symptoms by asserting, without support, that her testimony is inconsistent, though he does not specify with what." [Dkt. #20, at 13]. Of course, inconsistencies in testimony can support an ALJ's decision to find a claimant less credible.[6] *See, e.g.,* SSR 16-3p, 2017 WL 5180304, at *7 ("Very often, the individual has provided ... information [about symptoms] to the medical source, and the information may be compared with the individual's other statements in the case record."); *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (upholding credibility determination based on various inconsistencies between the plaintiff's alleged symptoms and the other evidence); *Michalec v. Colvin*, 629 F. App'x 771, 775 (7th Cir. 2015) ("In light of the inconsistencies between Michalec's statements to his doctors and his testimony at the hearing, Michalec has not shown that the ALJ's credibility assessment is patently erroneous."). As already noted, the plaintiff's testimony was filled with inconsistencies and contradictions, both internally and with the medical evidence. While the ALJ only singled out a few, it is enough to provide explanation or support for his determination. For example, the ALJ notes that plaintiff testified that she cannot leave the house or be around other people or she freaks out.

---

[6] While SSR 16-3p indicates that ALJs may not simply reject the claimant's claims because they believe he or she is untruthful, "[t]he change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016)

(R. 21). But she socializes daily with her boyfriend and family, and she didn't report these "freak outs" to her doctor. (R. 21-22). As the ALJ also noted, in terms of allegations of impaired thinking, concentration, or memory, in the main, examinations yielded normal findings. (R.21-22). He also noted that inconsistencies between the plaintiff's testimony about what doctors thought of her marijuana use, and what they actually told her. (R. 23).

Next the plaintiff complains about the ALJ's consideration of her daily activities, accusing the ALJ of equating them with an ability to function in a competitive work setting. [Dkt. #20, at 14]. It is true that the Seventh Circuit has taken ALJs to task for failing to recognize the "critical differences between activities of daily living and activities in a full-time job." *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012). But, there is no indication that the ALJ committed this error. He merely listed a number of plaintiff's activities – watching tv, playing video games, cooking daily, cleaning, doing laundry, driving and shopping – which clearly undermine allegations of isolation and hiding in one's rooms for days at a time. (R. 22-23). As the Seventh Circuit has made clear, it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether "'testimony about the effects of his impairments was credible or exaggerated.'" *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (quoting *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016)); *see also Morrison v. Saul*, 806 F. App'x 469, 475 (7th Cir. 2020).

Finally, the plaintiff's brief returns to its common theme: don't look at the medical evidence, consider only my allegations. She concedes that the evidence is, at best "sparse." [Dkt. #20, at 15]. But it seems, for her, that doesn't matter. Citing *Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015), plaintiff insists that the lack of medical evidence of a disabling psychological impairment "is certainly not a valid basis upon which to undermine a person's claims." Obviously, it cannot be that

benefits must be handed out on a plaintiff's say-so, and it isn't. *See, e.g.*, 20 CFR 416.929(a); SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016) ("We will not find an individual disabled based on alleged symptoms alone.). The plaintiff bears the burden of proving she is disabled with medical evidence. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. Feb. 23, 2021); *Sosh v. Saul*, 818 F. App'x 542, 546 (7th Cir. 2020); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir.2008). If the record is "sparse", so generally is the proof.

Beyond that, plaintiff's reliance on *Voigt* is a bit of what plaintiff might call a "leap of logic." [Dkt. #20, at 13]. There, the Seventh Circuit criticized the ALJ for disbelieving a doctors's dire opinion regarding a plaintiff's limitation because if they were that severe, the plaintiff would have to be hospitalized. *Voigt*, 781 F.3d at 878. But no mental healthcare provider, treating or otherwise, offered any dire opinion of plaintiff's abilities here. There is no doctor's opinion that she is disabled. There are, instead, essentially unremarkable examination notes – month after month, session after session. Allegations and unsupported assertions in a brief cannot fill the void. This is an instance where an appeal of the Commissioner's decision ought not to have been "a conditioned reflex." *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1202 (7th Cir. 1987)(quoting 1 Jessup, Elihu Root 133 (1938)).

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for summary judgment [Dkt.# 21] is granted.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 5-19-21